Reeves, J.
Heard on ease presented by cross-petition of John B. Kramer, treasurer of Fairfield county, Ohio.
In this ease the defendant, John B. Kramer, files his cross-petition in which he avers that there was a partnership composed of Towson, Martin and Cole, under the name and style of the Lancaster Bank, doing a banking business in the city of Lancaster; and on July 26, 1904, such proceedings were had that Henry B. Peters was appointed receiver of said bank and took charge of .the books, papers, etc,, and was at the time of the filing of this cross-petition engaged in administering the trust for the benefit of the creditors; and for his cause of action and the foundation of his prayer for relief says, that on July 8, 1904, he left with said defendant, the'Lancaster Bank, for collection, various checks and drafts, aggregating in amount the sum of $5,516.33, and from the eighth to the twenty-fifth of July inclusive, the aggregate of such sums being $20,589.70. He says that he kept no memorandum .nor .record of the various checks or drafts, and that for want of such record or any other means of identification he has been unable to describe the various checks and drafts, and says that- the defendant, the Lancaster Bank, has kept such memorandum.
The cross-petitioner, Kramer, states that at the time he made such deposits he was the treasurer of the county of Fairfield and state of Ohio, and that .those checks and drafts had been received by him as such treasurer in payment of certain taxes which the defendant, the bank, knew, and that there was an agreement between him and the bank that the bank was to collect these various checks and drafts and pay over the amount collected to him. And he avers that the bank has not done so; and that he is unable to make any statement or definitely set out what amounts, if any, had been collected. • He avers that this is known to the defendant, the bank, and to Peters, the receiver; he also avers that he does not know what amounts have been collected, but that this is known to the bank and to the receiver.
He also avers that at the .time these deposits were made the *390 bank was insolvent and unable to properly meet its obligations, and he makes the averment that the defendant fraudulently received those checks, having knowledge of that fact. lie again avers that neither the bank nor any of its agents or owners ever paid him any part of those various checks, nor has the receiver, Peters, although he has made demand upon the bank and the receiver; and then follows a prayer for an accounting, and he avers that by reason of those acts that he is entitled to a preference over and above the general creditors.
To that cross-petition there was also an amendment filed, which repeats the fact that he was the duly elected, qualified and acting treasurer of Fairfield county, Ohio; that the checks and drafts were received by him in payment of taxes and were the property of himself as such treasurer of Fairfield county, and that this was well known to the bank at the time the checks and drafts were deposited.
To this cross-petition an answer is filed by the bank, in which ■they say that none of the checks and drafts mentioned were ever received by said bank for the purpose of collection by said bank; that on the contrary the cross-petitioner delivered all said checks and drafts to the Lancaster Bank, which then and thereby became the owner of said checks and drafts, and that the bank concurrently delivered to him the various certificates of deposit in the aggregate sum of $20,589.70; that the said bank did not at any time agree -to collect the said checks and drafts or any of them, for the said Kramer, but it made all such collections of such drafts and checks on its own account, and the money and proceeds which it collected thereon belonged to it and not to said Kramer, and the said proceeds and moneys so by it received, when the said checks and drafts were passed and went into the funds a,nd moneys of said bank, or were placed to the credit of said bank, with its various correspondents in other cities than the city of Lancaster, Ohio, wherever said chefeks and drafts were payable; that at the commencement of this action the said Lancaster Bank was indebted to the said cross-petitioner, John B. Kramer, on said certificates of deposit in the- sum of $20,589.70, less the sum of $2,100 which had been *391 theretofore paid to said Kramer on said certificates, but the payment of said sum was not credited thereon; that the said Lancaster Bank did not agree with said Kramer or bind itself to keep the moneys and proceeds paid to it on said checks and drafts separate and apart from its other funds and moneys and the said bank was under no obligation to do so, and the said moneys and proceeds by it received on said checks and drafts were all the time commingled with, and became part of, the moneys of said bank, and the identity of the same wholly lost and destroyed, nor did the said bank ever agree or bind itself to or with the said John B. Kramer to return and deliver to him the identical money by it received on said checks and drafts.
I will not read the entire answer; it practically traverses all the material facts of this cross-petition which would tend to establish on the part of this cross-petitioner, Kramer, any right whatever to a- preference. It will be observed that there was no dispute between these parties as to the amount- of the checks and drafts received. The point of the contention is, whether they were deposited for collection or were merely deposits.
It is alleged in the answer to this cross-petition that $2,100 was paid, which I believe was denied in the reply. The testimony upon that point shows that it was not paid on those certificates at all, but it does appear in regard to that transaction that there had been a habit between the treasurer and the auditor from time to time of issuing what is known as refunders-, which were generally small items aggregating in the course of several months considerable sums; it was the habit of the treasurer to carry these refunders along and make a settlement with the auditor and commissioner, and receive one voucher for the whole business, and at certain times it had been the practice of the examiners of the treasurer to treat them as cash. Some of the examiners refused to do that, and as a matter of accommodation to the parties Mr. Kramer sent his own check down to the amount of $2,100, and asked .the bank to carry that for him and as a matter of accommodation, and the bank *392 did. that; but that transaction was on June 5, and was prior to all these certificates, so that it had no connection whatever with those certificates of deposit. The defendant, Kramer, in his cross-petition, claims a preference on the fund in the hands of the receiver, and I might state that at the time- the bank went into the hands of this receiver there was something like $5,000 or $6,000 actual money toned over to -the receiver.
It appears from the testimony introduced here that there was a large amount of loans, and as I remember as far as the evidence shows all of these loans were prior to the date of this first certificate; that is, there is no evidence tending to show that these loans were made subsequent to the issuing of this first certificate of deposit. It appears from the testimony that for some cause, by reason probably of some rumors circulating on the' street, the confidence of the public in the bank was shaken, and there was a run on the bank,. lasting something over two days; and that the bank was paying out the money it had. on hand; that they took a large amount of securities and went to the city of Columbus and withdrew from their depository whatever they had on hand, and in addition to that they took a large number of notes and other securities and deposited them in bank there to secure a loan of between $40,000 and $50,000. That was handed over the counter to restore confidence, but in the final wind-up when the property was turned over to the receiver, the bank had somewhere between $5,000 and $6,000 on hand.
Now the cross-petitioner asks for this relief on two grounds practically, or as I might say one ground, sustained by the further fact that he was treasurer.
First, he claims that all those cheeks and drafts which he deposited had been theretofore received by him and were made payable to him as treasurer of this county, and had been received by him from certain individuals and corporations in payment of .their taxes then due; he was at this time in the midst of the collection; in .fact the winding up of the collection of the taxes on the duplicate for the June payment of 1904. Although the time allowed by the statute was the twentieth of June, it *393 has been the habit of all the county treasurers to extend the time of payment for one month and generally np to the last day of July, in the first place to prevent a rush in the last few days .of collection, and in the second place to give the tax-payers an opportunity to get their money, and to give the farmers time to obtain the money to pay their taxes. This has been the habit of former treasurers and it was an accommodation to tax-payers, but a treasurer is not bound to receive taxes after the twentieth of June.
It has been the custom for the treasurer to receive checks in payment of taxes. This is also an accommodation, for if a mistake should be made when money was paid, there would always be some trouble in makifig the correction. It is especially an accommodation for a tax-payer who resides out of the county. There is no law which prohibits the payment of .taxes by check, but for the protection of the treasurer it is understood that if the check is not'paid the taxes are not paid. Although he has the right to demand the money down, yet for his own accommodation and for the accommodation of the tax-payers this rule has been established. According to .the testimony the checks of local tax-payers were payable on local banks. There are banks in the villages in this county, and some of those cheeks were drawn on those bhnks. It was not supposed that the treasurer would take his horse and buggy and go around to those banks in the villages in this county to collect those checks but he would be expected to collect them through .the banks of Lancaster. Though many of those checks were drawn on banks in the villages of the county, the great bulk of them were payable at banks in this city.
It appears that some time prior to 1904 the treasurer of the county was also the treasurer of the city fund, and that whereas, the statute provided that the treasurer of the county could not deposit the county funds in bank, there was no prohibition against depositing the city funds in bank. Up to the time the statute was changed at the passage of -the present municipal code, which took the treasuryship of the city from the county treasurer, and placed the funds in the hands of another officer, *394 these city funds had been allowed to remain in the bank and the bank, by reason of having these funds deposited, had as a matter of accommodation made those collections without any charge whatever.
It is claimed on behalf of the defendant, Kramer, that after the passage of the municipal code and the transfer of the city funds from his possession to the possession of the city treasurer, he had still been in the habit of depositing those checks in this bank for collection. His attention was called to the fact that they were not now receiving anything by reason of having those funds in there for their services, and that therefore they ought not to be required to pay those checks immediately. It seems that prior to that time, if a cheek had been drawn on the Canal Winchester Bank or even a New York bank, wherever it was the bank collected it without any charge and without saying anything about it. But it is claimed that was changed and the officers of the bank called his attention to that fact, and stated that they ought not to be required to be out of this money while it was in process of collection. Thereupon it was understood between them that these checks when brought to the bank were to be left there for collection, and the money was not to be paid to the treasurer until it had been collected.
■ It is claimed on behalf of the cross-petitioner that the bank agreed just as soon as it collected the money to bring it up to the treasurer. That is denied. It is claimed on the other side that the understanding was, that these checks were to be deposited there, and that the money was to be collected and was to remain there until the treasurer needed it. I might say that after that arrangement was made the evidence of the deposit of those checks and drafts was delivered to the treasurer.
It was the habit of the examiners of the treasury as shown by the testimony to treat those papers — call them certificates of deposit or receipts for collection — as cash; because they were in process of collection they were treated as cash. But there came a time when the state of Ohio began to send out examiners, and it seems they refused to treat them in that way, and some of the examiners got a little more technical and refused to treat *395 them as cash and at last required that if they had been deposited the treasurer have the money on hand.
Then it was arranged that if at any time an examination was to be had that the bank would pay over all the money they had, and if necessary advance the balance of the money to cover those checks and drafts that had not yet been collected and the collections remitted back or certified back. These were the arrangements. It practically was not denied in rebuttal, that that had been the arrangement. And it was testified that it was understood that if at any time by reason of any technical examination, although the drafts had just been put in process of collection, yet if the treasurer needed that money all he had to do was to send this receipt or certificate down to the bank and get the money. These were the arrangements as shown.
It appears as shown here by the petition that the first deposit was made on July 8 and then it rhn on to July 11, 12, 14, 15, and up to July 25, just the day before this bank went into the hands of a receiver.
When these deposits were made whether for collection or otherwise the treasurer received from the bank on a form used' by the bank as a certificate of deposit the following:
"$5,516. "Lancaster, Ohio, July 8, 1904.
‘ ‘ This is to certify that J. R. Kramer has deposited for collection fifty-five hundred and sixteen dollars payable to the order of himself, out of the current funds of this bank, on the return of this certificate properly indorsed.”
Now that is the form practically of all these eertificaAes of deposit, except that in the one dated July 8, it says John B. Kramer; it is not disputed that the word "treasurer” is omitted.
The testimony tends to show that the large bulk of these checks deposited were on banks in the city of Lancaster, the four banks of the city of Lancaster. It will be observed that in none of these certificates and attached to none of them is there any schedule of the checks deposited, that the treasurer kept no memorandum of the individual checks deposited, whom they were signed by, whom they were drawn on and what banking institu *396 tion they were drawn on, or their date. The treasurer kept no memorandum whatever of the checks or drafts and he called on the officers of the bank in the nature of a 'disclosure to disclose to' him the amounts. And it seems that after a careful examination of the interrogatories annexed to the petition and the testimony -that as far as the efforts of the treasurer have been concerned, that there has been a total failure here to trace any amount to any particular bank or individual.
It appears that these different checks were not entered on what is known as the collection record; they were not even indorsed for collection; they were just indorsed, generally, “John B. Kramer, treasurer,” and handed into the bank, and although there has been an effort made and learned counsel have made every effort that human power could make, to trace and discover the names of the persons, the hanks upon which they were drawn, (the amounts and dates, yet there has been a total failure as far as the evidence is disclosed to do that, and it appearsYrom examination of the books that it is impossible to trace .these individual deposits to any particular bank or show by whom they were drawn.
It seems when these checks were received they were just turned over as ordinary checks in bank and seem, to have been treated just as ordinary checks coming into the bank. So that it has been impossible to trace any of these particular checks or the application of the funds arising from any one of those cheeks. It is admitted that between one-fifth and one-sixth of them were on the Lancaster B.ank, represented by Peters, the •receiver, and that probably a proportionate amount was represented by checks or a large amount of'.the balance on the other three banks, and that the great bulk of the balance was represented by checks drawn on banks in this county and adjacent cities, the city of Columbus principally. And it appears that so .far as the testimony is concerned that none of these funds arising from any of those checks could be traced into the hands of this receiver after his appointment. In other words it could not be shown that he received the proceeds of any of those checks after his appointment as receiver.
*397 That is the state of facts. To these facts the court must apply the law. The rule laid down is pretty well stated in one of the authorities cited by counsel for cross-petitioner in their brief:
“The beneficiary of the express trust may follow the trust,, may follow the property into the trust funds in ease of insolvency, but in all cases he must show -¡that the property is actually represented in the assets.”
Counsel on both sides have filed elaborate and very learned briefs. The court has taken time to examine as far as it could the authorities cited. The burden of proof is upon this cross-petitioner to establish that these were trust funds, that there was a trust relation between him and this bank and its officers, that he took all the precautions that a man ordinarily could to retain his funds, control of his funds, and that he was in such condition in fact.
Suppose for the purposes of the argument that this bank closed on the twenty-sixth, that he had deposited a number •of checks and drafts that day, drawn on banks outside of this particular bank. He must have been in such position that he could identify those checks; that he could stop payment upon them. Suppose the check was on Columbus. To claim to be the owner, he must be able to stop payment, so that he could notify the bank, “You must not pay that money to the Lancaster Bank; that is my money; it is a trust fund.” That seems to be the weight of the authorities.
And another question has been raised on behalf of this bank, and also not only by the bank but a number of other creditors, the Perpetual building association, which had a very large deposit, in fact the largest deposit in this bank.
It is shown in the testimony that from one-fourth to one-fifth or say to one-sixth of those checks were drawn on the Lancaster Bank itself, payable at the Lancaster Bank, and were draAvn on the Lancaster Bank by depositors of funds in the Lancaster Bank in payment of their taxes, and probably that proportion in the other banks in the city, so that probably from four-fiftfis to five-sixths of the funds here as far as the evidence discloses was payable at banks in this city.
*398 It is argued first as to the Lancaster Bank: That when these checks were taken to the Lancaster Bank, that the Lancaster Bank undertook to. collect from its own depositors; that this money Avas held in a trust relation. That was argued with considerable ability and skill. Hoay is that?
The rule of law is, that if a check is draAvn by a depositor on a bank, it is the duty of the bank immediately to pay that money. How could that fund be kept separate? Not by entering it on the books. If the bank did not hand it over, how could he say that the bank was holding it in trust for him?
Take the other banks of the city. Unless there was an agreement that the money was to be kept separate, put in an envelope and laid away by itself, it would not become the money of the cross-petitioner. It is true that it is a matter of convenience to the treasurer to deposit checks in this way. These checks were not indorsed for collection. It has been testified here and it is a matter of common knowledge that these banks every day have a • settlement with each other. It has been testified here and is well knoAvn to every citizen Avho has dealings Avith banks, that a'cashier of-one bank will call on another and find out how.much each bank is indebted to the other on checks and drafts, and if there is a balance in favor of one of the banks that is settled. The bank with the least amount of checks and drafts pays over the difference.
Suppose for the purpose of the argument that John B. Kramer had gone there at the -time Avhen these cashiers were making exchanges; suppose he had heard the bank was in bad condition ; if they were not indorsed for collection, it is a question Avhether he could stop their exchange unless he had an injunction. But if those checks were indorsed for collection, that would be notice to the bank that it was a private account; they could not say, “Here you must take those general cheeks we have as against.those checks here for collection.” • .
Again: Some of these checks Avere deposited as early as July 8 and the bank closed July 26. Every one, as I said before, having business with the banks here, is aware of the fact that those banks make exchanges every day. The treasurer *399 must have known that, by the afternoon of July 9 and before the bank closed, the Lancaster bank had every dollar on those checks and drafts deposited on July 8, or its equivalent.
The officers of the bank claim -that there was an agreement and understanding that these deposits would remain in there, and they say that the words ‘for collection’ were written in the certificate of deposit for the protection of the treasurer; but the court has, when it comes to apply the law that gives a preference, to be clearly satisfied that there was a preference, and that the party making it took the precautions that the law requires. The depositor musit deal with the bank strictly, if he wants a preference; he can not deposit in his own name in the general funds of the bank, and when the identity of the deposit is lost claim a preference. So that in this agreement Kramer had with the bank, that as soon as this money was collected it was to be turned over to him, he certainly had notice that the money was in bank, that exchanges were made every day, and that if the officers of the bank did not bring up the money, he could have sent down his certificate and got it or telephoned them to bring it up to his office.
Now in regard to these collections from foreign banks:
We all know that even if 'a check is sent to the city of New York, inside of three days at least, there is a remittance or some notice concerning it. This matter had been going on from July 8 to July 26. While I acknowledge the rule, and would be glad to enforce the rule in this case relating to the deposit of funds in a trust capacity, these other creditors have the same right this creditor has, and he is asking for something beyond the rights of other creditors. He is asking the court to reach into this fund and take out this $20,000 and give it to him with interest from the dates of those different deposits — at least from the date of their probable collection.
I think the law'in this case is pretty well settled in the case of Philadelphia Nat. Bank v. Dowd, 38 Fed. Rep., 172, where nearly all those authorities which have been cited are commented upon. The court read from this ease.
In the light of those facts the court is driven to the conclu *400 sion that the only right .that this creditor has is that of a general creditor.
Lane & Lane, for Kramer.
C. W. McCleery and M. A. Daugherty, for receiver.
I want to say one thing, however, which I feel it my duty to say in view of some matters that came up and some suggestion made in argument, that there might be some reflection cast upon this treasurer. I want to say this, there can be no reflection from anybody upon this treasurer. Pie honestly believed that by those proceedings he was depositing these moneys in a trust relation, and that they were not deposited in any way so as to conflict with the statute and his duty as treasurer. '
The testimony shows that this treasurer is entitled by reason of the manner in which he has conducted his office, to the gratitude and commendation of the public. Pie never received a cent from any of these deposits as shown by the testimony; it is a matter that he may be proud of, and that this whole community may be proud of, because it is an exceptional case in this state; he has conducted his office honestly; anybody that makes any reflection upon him stultifies himself and not the treasurer. The only trouble is, he was not a bank lawyer. The intricacies of the bank law are such now that very few persons, unless they malee it a special study, could make a deposit of this kind without examining recent decisions and preserve a preference and a trust; his intentions were good; he made his best efforts to preserve a preference; the trouble was, that he did not understand the necessary requirements of the law to preserve a preference in this case. lie is not to be censured for that; his acts should receive the approval of the entire community for the faithful and honest ■ manner in which he has conducted his office.
In the judgment of this court this cross-petition will have to be dismissed.